UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| RONALD E. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 22-216-DCR |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHANIE SUMNER, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of a motion to dismiss, or alternatively, for summary judgment filed by Defendants Stephanie Sumner, Ms. Lawson, and Carrie Cunnagin. [Record No. 16]  Plaintiff Ronald Smith has filed a pleading captioned "Rebuttal and Request to be Appointed Counsel" in response [Record No. 18] and the defendants have filed a reply. [Record No. 19]  The matter is briefed and ripe for review.

## I.

As a preliminary matter, Smith's "Rebuttal" includes a request that the Court appoint counsel to represent him, stating that the paralegal who has been assisting Smith will soon be released.  [Record No. 18 at p. 3] Smith believes that appointment of counsel is warranted considering the "seriousness of the matter" and because he is incarcerated with limited funds. He also refers to the "reluctance of the Bureau of Prisons and individual institutions to provide complete medical records to inmates" as a basis for his request, inasmuch as an "outside attorney . . . can access and obtain the necessary copies of all pertinent medical records."  [*Id.*]

-1-

However, "[t]he appointment of counsel in a civil proceeding is not a constitutional right and is justified only in exceptional circumstances." *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003). When considering whether to grant such a request, the court considers the complexity of the case, the movant's likelihood of success on the merits of the claim, and the ability of the plaintiff to represent himself competently. *Cleary v. Mukaskey*, 307 F. App'x 963, 965 (6th Cir. 2009).

Upon full review of the above factors, the Court concludes that this case does not present the kind of extraordinary circumstances which would warrant appointment of counsel. While Smith's allegations relates to medical needs, his claims are not unduly complex and he has adequately presented them in a complaint. In addition, Smith has demonstrated an ability to represent himself as shown by his response to the defendants' motion which includes an analysis of the medical records relating to his claims. [Record No. 18]

To the extent that Smith's reference to general difficulties experienced by inmates when requesting medical records could be broadly construed as a motion under Rule 56(d) of the Federal Rules of Civil Procedure requesting that the Court defer consideration of Defendants' motion pending discovery, his does not request discovery nor does he suggest that he has personally been denied access to any medical records necessary to respond to the defendants' motion. Moreover, the defendants have submitted approximately 480 pages of medical records related to Smith's claims [Record No. 16-2, Cimarrosa Decl., Att. B], and Smith does not contend that the defendants' submission was incomplete or misleading. In fact, he re-submits several of these same records through his Rebuttal. [Record No. 18-1] Finally, Smith's Rebuttal does not include an affidavit or declaration which must be submitted in support of

-2-

Rule 56(d) motion. *See* Fed. R. Civ. P. 56(d) (requiring the non-movant to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition"). Thus, Smith's motion will be denied to the extent that his Rebuttal could be construed as a separate motion to appoint counsel and/or a request for discovery filed pursuant to Fed. R. Civ. P. 56(d).

## II.

Smith alleges that, on September 16, 2021, he was transferred to the United States Penitentiary ("USP")-McCreary with an open right shoulder wound that was "bleeding, draining, burning, red and extremely painful." [Record No. 5 at p. 2] He further alleges that, upon arrival, he was placed in COVID quarantine for 22 days with no medical care or medication for this wound. [*Id.*] Smith asserts that, after he was released from quarantine, he was placed in a cell in Unit A with another inmate. [*Id.*]

According to Smith, after he completed out numerous "sick-call" forms, Defendant Nurse Lawson "finally" brought him several bandages for his wound, but did not attempt to place the bandages on his wound. [*Id.*] He states that, when he asked Lawson how he was supposed to put the bandages on his right shoulder (as he is right-handed), she replied, "Figure it out." [*Id.*] Smith contends that he was told "several times" by Lawson and MLP Sumner to have his cellmate change his dressings for him. [*Id.*]

But according to the medical records submitted by the defendants, Smith was seen for a history and physical on September 21, 2021, during which he reported a "sore" on his right shoulder, which he stated had been present for about 3 years and was getting bigger. There was no drainage noted from the area at that time, but some dry drainage was noted regarding Smith's old dressing. Smith stated that he had never seen dermatology for evaluation. The

acting clinical director believed the area on the plaintiff's shoulder was possibly a pyrogenic granuloma and a dermatology consultation was requested. Sumner also directed that Smith be provided with gauze sponges weekly for 30 days. [Record No. 16-2, Cimarossa Decl., Att. B at p. 65-66] Thereafter, Smith was provided with bandages on September 26, October 2, October 9, and October 17. [*Id.* at p. 73] Smith received wound care treatment from Nurse Privett and Lawson two times on November 11 and again on November 12, 13, 14, 15, and 16. [*Id.* at p. 79]

Smith also asserts in his Amended Complaint that, on November 9, 2021, he was taken for an outside appointment and on November 29, 2021, he was notified that the lesion was cancer. [Record No. 5 at p. 3] Smith claims that he was "repeatedly denied necessary and crucial appointments and follow-ups by outside physicians and specialists once the lesion was determined to be a rare form of cancer." [*Id.*] Specifically, he states that on December 15, 2021, doctors at the University of Kentucky Medical Center "informed USP-McCreary" to refer his case to a General Surgeon, as his was a very rare form of skin cancer. [*Id.*] But Smith claims that "Carrie Cunnagin repeatedly ignored the physicians at the University of Kentucky when they had ordered specialized treatment and follow-up appointments." [*Id.*]

According to Smith's medical records, on December 14, Sumner submitted an urgent consultation for an initial General Surgeon evaluation, which was scheduled for December 28. [Record No. 16-2, Cimarossa Decl. at Att. B, p. 20] On December 28, the General Surgeon referred Smith to the Markey Cancer Center at the University of Kentucky. [*Id.* at p. 572] An Urgent Consult request was placed [*id.*] and Smith was seen by an Oncologist on February 3. [*Id.* at p. 287] On February 15, 2022, Smith had surgery for the cancerous lesion and was hospitalized at the University of Kentucky until March 3. [*Id.* at p. 254, 279]

-4-

Smith states that, after undergoing surgery on February 15, 2022, "after-care was non-existent" and "[r]equired follow-ups were ignored," and "medications were ignored or denied." [Record No. 5 at p. 3]  He further contends that the lesion "appears to be returning." [*Id.*] However, according to his medical records, after Smith was discharged and returned to USP-McCreary, he was repeatedly evaluated and provided medication and other treatment by medical staff throughout March and April and sent out for follow-up appointments with Oncology. [Record No. 16-2, Cimarossa Decl. at Att. B., p. 225-248]  Smith was transferred to FMC-Lexington on May 4.

According to Smith, after surgery on February 15, he began the Administrative Remedy Process at USP-McCreary. [Record No. 5 at p. 3] He acknowledges that the "official replies" to his grievances indicated that certain forms were missing, but Smith attributes this problem "to the Administration at USP McCreary attempting to stall or nullify the entire process." [*Id.*] He claims that once he was transferred to the FMC-Lexington, he "receive[d] replies to [his] requests and finally began receiving regular exams, testing, and care for the wound." [*Id.*] Based on the foregoing allegations, Smith seeks to assert claims against Defendants Sumner, Lawson, and Cunnagin based on the denial of medical treatment in violation of his rights under the Eighth Amendment. [Record No. 5 at p. 4]

The defendants seeks dismissal of Smith's Amended Complaint based on his failure to fully exhaust his available administrative remedies before filing suit. [Record No 16]  They further argue that dismissal is also warranted because, in light of the United States Supreme Court's decision in *Egbert v. Boule*, 142 S.Ct. 1793 (2022), this Court should decline to imply a *Bivens* remedy for Smith's Eighth Amendment claim because it arises in a new context and there are several special factors counseling against its recognition.  [*Id.*]  Alternatively, they

argue in that summary judgment is appropriate because Smith's medical records demonstrate that prison medical staff were not deliberately indifferent to his medical needs. [*Id.*]

Smith disagrees with the defendants' contentions, repeating his claims that Lawson and Sumner directed him to have his cellmate change his dressing and claiming that the medications provided post-surgery did not adequately relieve his pain. [Record No. 18] However, he does not address the defendants' argument that his Amended Complaint should be dismissed by virtue of his failure to exhaust his administrative remedies prior to filing of this action. Nor does he address whether this Court should decline to imply a *Bivens* remedy regarding his Eighth Amendment claims.

### III.

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the plaintiff's complaint. *Gardner v. Quicken Loans, Inc.*, 567 F. App'x 362, 364 (6th Cir. 2014). When addressing a motion to dismiss, the Court views the complaint in the light most favorable to the plaintiff and accepts as true all "well-pleaded facts" in the complaint. *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014). And because Smith is proceeding without the benefit of an attorney, the Court reads his complaint to include all fairly and reasonably inferred claims. *Davis v. Prison Health Servs.*, 679 F.3d 433, 437-38 (6th Cir. 2012).

Here, the defendants move to dismiss the Amended Complaint *and* request summary judgment as an alternative remedy, attaching and relying upon declarations extrinsic to the pleadings in support. [Record No. 16] As a result, the Court may treat the defendants' motion to dismiss the complaint as a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d); *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F. 3d 1102, 1104 (6th Cir. 2010). *See also Ball*

*v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (where defendant moves both to dismiss and for summary judgment, plaintiff is on notice that summary judgment is being requested, and the court's consideration as such is appropriate where the nonmovant submits documents and affidavits in opposition to summary judgment).

A motion under Rule 56 challenges the viability of another party's claim by asserting that at least one essential element of that claim is not supported by legally sufficient evidence. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  A party moving for summary judgment must establish that, even viewing the record in the light most favorable to the nonmovant, there is no genuine dispute as to any material fact and that the party is entitled to a judgment as a matter of law.  *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014).  The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994).  To defeat a properly supported motion for summary judgment, the party opposing it may not "rest upon mere allegation or denials of his pleading," but must present affirmative evidence supporting his claims.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).  If the responding party's allegations are so clearly contradicted by the record such that no reasonable jury could adopt them, the court need not accept them when determining whether summary judgment is warranted.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### A.

The defendants argue that Smith's claims must be dismissed because he failed to fully exhaust his administrative remedies prior to filing his lawsuit, as required by the Prison Litigation Reform Act of 1995 ("PLRA").  Under the act, a prisoner wishing to challenge the

circumstances or conditions of his confinement must first exhaust all available administrative remedies.  42 U.S.C. § 1997e(a).  The statutory language of the PLRA provides that "[n]o action shall be brought with respect to prison conditions under . . . any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).  *See also Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court but is mandatory.") (citation omitted); *Napier v. Laurel Cty., Ky.*, 636 F.3d 218, 222 (6th Cir. 2011) (the exhaustion requirement is a "strong one"); *Fazzini v. Northeast Ohio Correctional Center*, 473 F.3d 229, 231 (6th Cir. 2006).

Administrative remedies must be exhausted prior to filing suit and in full conformity with the agency's claims processing rules.  *Woodford*, 548 U.S. at 92-94.  The federal Bureau of Prisons' ("BOP") Inmate Grievance System requires a federal inmate to first seek informal resolution of any issue with staff.   28 C.F.R. § 542.13.  The informal grievance is generally referred to as a "BP-8" or "BP-8 ½."  If a matter cannot be resolved informally, the inmate must file an Administrative Remedy Request Form (BP-9 Form) with the Warden within 20 calendar days following the date on which the basis for the Request occurred, unless an extension is allowed because the inmate demonstrates a valid reason for delay.  28 C.F.R. §§ 542.14(a), (b).  The inmate's BP-9 Request should be limited to "a single complaint or a reasonable number of closely related issues."  28 C.F.R. §542.14(c)(2).  The Warden has 20 days to respond to the inmate's BP-9 Request.  28 C.F.R. § 542.18.

If an inmate is not satisfied with the Warden's response, he may use a BP-10 Form to appeal to the applicable Regional Director, who has 30 days to respond. *See* 28 C.F.R. §§ 542.15 and 542.18. And if not satisfied with the Regional Director's response, he may use a BP-11 Form to appeal to the General Counsel, who has 40 days to respond. *See* 28 C.F.R. §§ 542.15 and 542.18. *See also* BOP Program Statement 1300.16. At any level, "[i]f the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. § 542.18. Because "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules...," *Woodford*, 548 U.S. at 90, the inmate must file the initial grievance and any appeals within these time frames and in accordance with these rules.

Failure to exhaust administrative remedies is an affirmative defense; therefore, the Defendants bear the burden of proof. *Jones*, 549 U.S. at 212. "When the defendants in prisoner civil rights litigation move for summary judgment on administrative exhaustion grounds, they must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)). An inmate must make "some affirmative efforts to comply with the administrative procedures," and the Court will analyze "whether an inmate's efforts to exhaust were sufficient under the circumstances." *Napier*, 636 F.3d at 223-24. Summary judgment should be granted "if a defendant establishes that there is no genuine dispute of material fact that the plaintiff failed to exhaust." *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019).

Smith's response to the defendants' motion does not address Defendants' administrative exhaustion argument at all. "As a practical matter, 'it is well understood . . .

that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.'" *Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 759–60 (E.D. Ky. 2019) (quoting *Rouse v. Caruso*, No. 6-cv-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011). Thus, his failure to rebut the defendants' argument constitutes a reason to grant their motion to dismiss the plaintiff's Amended Complaint for failure to exhaust his administrative remedies.

Even so, the Court has examined the relevant administrative remedy documentation attached by Smith to his original Complaint [Record No. 1-1] and Amended Complaint [Record No. 5-1], as well as the additional official records submitted by the defendants regarding Smith's administrative grievance history maintained by the BOP [Record No. 16-1, Martinez Decl.],[1] and concludes that the defendants are correct that Smith failed to fully exhaust his available administrative remedies prior to filing this lawsuit.

Smith alleges that, after surgery on February 15, 2022, he "began" the Administrative Remedy Process at USP-McCreary. [Record No. 5 at p. 3] With respect to the administrative grievance that he claims to have exhausted, in the "Exhaustion of Administrative Remedies" section, he indicates that he filed a request or appeal to the Warden on February 14, 2022; he appealed to the Regional Director on August 4, 2022; and he appealed to the Officer of General

---

[1] While the sufficiency of the complaint is generally evaluated with reference only to the face of the complaint itself, *Burns v. United States*, 542 F. App'x 461, 466 (6th Cir. 2013), documents attached to the complaint or incorporated into the complaint by reference may also be considered. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). *See also Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). In addition to attaching copies of various administrative remedy requests and responses to his original Complaint and Amended Complaint, Smith did not object to Defendants' submission of additional grievance-related documents in support of their Motion to Dismiss.

Counsel on September 13, 2022.  [Record No. 5 at p. 4]  However, the Administrative Remedy receipt dated February 14, 2022, and attached to Smith's original Complaint refers to an Administrative Remedy Request filed on February 4, 2022, which was assigned Remedy ID 1110096-F1.  [Record No. 1-1 at p. 1]  Based on the timeline cited by Smith in his Amended Complaint, this is the Administrative Remedy Request that he claims to have fully exhausted prior to filing this lawsuit.  However, after fully examining the history of this Administrative Remedy Request, as well as other Remedy Requests that Smith filed during the relevant period, it is clear that Smith did not properly exhaust any of his Administrative Remedy Requests.

Further information regarding the background of Smith's February 4, 2022, Administrative Remedy Request is provided by the documentation submitted by the defendants.  On January 13, 2022, Smith filed a BP-8 at USP-McCreary alleging that he had "pus coming out of an open wound due [to] a cancer tumor," he was in "extreme pain" every day," that "medical refuse to provide any antibiotic or pain medication," and requesting "[f]or somebody to give me some kind treatment."  [Record No. 16-1, Martinez Decl., Att. D]  Prison staff responded to this request on January 19, 2022, explaining that Smith had been evaluated by various medical providers (including a Physician, Dermatology, and General Surgery) multiple times after his arrival at USP-McCreary on September 21, 2021, and that he had an appointment scheduled with oncology.  [*Id*.]  That same date a BP-9 was issued to Smith.  [*Id*.]

Smith completed this BP-9 on January 31, 2022, and submitted it to the Warden on February 4, 2022.  [*Id*.]  Thus, this is the Administrative Remedy Request to which Smith refers and that was assigned Remedy ID 1110096-F1.  The Assistant Heath Services Administrator responded to Smith's BP-9 on February 14, 2022, indicating that Smith was

prescribed medication.  [*Id.*]  On February 16, 2022, the BP-9 was closed as withdrawn by Smith.  [*Id*. at Att. C]

Even if the Court assumes that Smith did not receive the response to his BP-9 on February 14, 2022 – or that he was unaware that the BP-9 was closed as withdrawn – if no response is received at any level of the grievance process, an inmate is permitted to construe the lack of response as a constructive denial, which may then be appealed to the next level. *See* 28 C.F.R. §§ 542.15 and 542.18.  Thus, if Smith had not received a response to his BP-9 before February 24, 2022 (20 days after it was received by the Warden), he could have then appealed the constructive denial of his BP-9 Request by filing a BP-10 Form with the Regional Director, which he did not do.  Thus, Smith did not exhaust his administrative remedies regarding this grievance.

Instead, Smith began the process anew by filing a new Informal Resolution Form (BP-8), dated March 23, 2022.  [Record No. 5-1 at p. 1]  Smith states in this request that he had surgery on his upper right shoulder on February 14, 2022, and "at this present time I'm in severe pain due to negligence to the wound not being cleaned by medical." [*Id*.]  He also complains that, although he was schedule to see the doctor on March 22, "today is March 24th I've yet to see anyone!"  [*Id*.]  Smith's Correctional Counselor responded to his request and issued Smith a BP-9 Form on March 30.  [*Id*. at p. 1-2]  Smith did not file a BP-9 Form regarding this grievance.  [Record No. 16-1, Martinez Decl. at p. 4] As a result, this second administrative remedy request was not exhausted.

Smith was transferred to FMC-Lexington around May 4, 2022.  On June 15, 2022, Smith began the grievance process a third time by filing a new BP-8 at FMC-Lexington, complaining, that because "medical delayed treatment", his condition became worse. [Record

No. 5-1 at p. 3]  Smith further complains that, "[a]fter surgery, medical staff at McCreary USP and FMC Lexington [did] not provided [him] with adequate pain management" and indicates that he previously submitted a BP-8 and BP-9.  [*Id*.]  The Correctional Counselor responded to Smith's June 15 BP-8 and a BP-9 Form was issued to Smith by Counselor Curtsinger on June 16, 2022.  [*Id*.]

On June 28, 2022, Smith filed a BP-9 appealing the response to the remedy that he filed on June 15.  [Record No. 5-1 at p. 4]  In his BP-9, Smith states that "[he] fully understand the cause of this issue is with the Administration and Medical staff at USP McCreary, but it continues here since [he] was sent here to have it corrected."  [*Id*.]  Smith then complains about the sick-call process and his treatment for his pain at FMC-Lexington.  [*Id*.]  According to the assertion in Smith's Amended Complaint, this BP-9 was "lost" by Counselor Curtsinger.  [Record No. 5 at p. 4 (referring to a "lost" BP-9); Record No. 5-1 at p. 7]  According to the defendants, "[d]ue to confusion about whether or not this BP-9 related to Smith's earlier, withdrawn administrative remedy, it was not entered in the BOP's sentry database and there was no immediate response."  [Record No. 16-1, Martinez Decl. at p. 4-5]  Regardless, neither party contends that Smith received a response to this BP-9, thus his BP-9 would have been constructively denied on or around July 18, 2022 (20 days after its submission), at which point Smith had 20 days (or until approximately August 7, 2022) within which to appeal the construed denial by filing a BP-10.  *See* 28 C.F.R. § 542.15.

Smith filed a (belated) BP-10 with the Regional Director on August 17, 2022.[2]  Smith states in his BP-10 that "[t]his is a direct appeal filed at FMC Lexington, which is currently

---

[2] Although Smith signed his BP-10 on August 4, 2022, an administrative appeal is considered "filed" on the date that it is received.  *See* 28 C.F.R. § 542.18.

'lost' according to Cnslr Curtsinger.  It is also a continuation of the Informal Resolution Process begun at USP McCreary on 3/10/2022." [Record No. 5-1 at p. 6] Smith then complains about follow-up treatment, pain management and nursing care at USP-McCreary, and claims that he was told to have his cellmate change his wound dressings at USP-McCreary from the time of his arrival in September 2021 until his shoulder surgery was performed in February 2022.  [*Id*. at p. 6-7]

The Mid-Atlantic Regional Office returned Smith's BP-10 appeal as rejected on August 26, 2022, because it was untimely and for failing to provide staff verification stating that the untimely filing was not his fault and because he did not provide a copy of the BP-9 or the response from the Warden.  [Record No. 5-1 at p. 5]  Smith was instructed that he could return his BP-10 with the BP-9, the Warden's response, and a staff memo stating why his appeal was untimely.  [*Id*.]  But rather than re-submit his BP-10, on September 15, 2022, Smith filed a BP-11 appealing the Regional Office's response to the BOP's Central Office [Record No. 1-1 at p. 13], which was rejected and returned to Smith on October 7, 2022.  [Record No. 16-1, Martinez Decl., p. 6]

Based on the foregoing, the Court concludes that Smith did not properly exhaust his administrative remedies with respect to his claims for multiple reasons.  First, he did not appeal the February 14, 2022, response to his BP-9 by timely filing a BP-10 with the Regional Director, at which point, that Administrative Remedy Request was properly closed.  Nor did Smith file a BP-9 to appeal the response to the BP-8 Smith filed on March 23, 2022.  And, while Smith did attempt to appeal the BP-9 related to the BP-8 that he filed at FMC-Lexington on June 15, his appeal was not timely, nor did he correct the defects set forth in the notice rejecting his BP-10 filed on August 17.

-14-

Moreover, in his August 17 BP-10, Smith indicated that his appeal was both a "direct appeal filed at FMC-Lexington," as well as a "continuation of the Informal Resolution Process begun at USP McCreary on 3/10/2022." [Record No. 5-1 at p. 6]  It appears that the "Informal Resolution Process" to which Smith is referring is the BP-8 filed at USP-McCreary on March 23, 2022 (not Remedy ID 1110096-F1 which was closed on February 16), as the March 23 BP-8 has a "Tracking #" of "03-10-22," which is also repeated in the heading of the Response. [*See* Record No. 5-1 at p. 1-2]  However, 28 C.F.R. § 542.15 provides that "[a]n inmate may not raise in an Appeal issues not raised in the lower level filings," nor may an inmate "combine Appeals of separate lower level responses (different case numbers) into a single Appeal."  28 C.F.R. § 542.15.  Thus, Smith could not "revive" either of his closed administrative remedies by referring to them in a BP-10 filed related to a third grievance.  And even if he could, his August 17 BP-10 was still properly rejected as it was untimely, and he failed to comply with the directions in the rejection notice regarding how to cure his faulty BP-10.  Moreover, while Smith claims that Curtsinger "lost" the BP-9 filed at FMC-Lexington on June 28 (which appealed the resolution of his June 15 BP-8), there is no indication in either Smith's pleadings or his administrative remedy history that he ever submitted a BP-9 appealing the denial of his March 23 BP-8.

Smith does not dispute this timeline of events in his response to the defendants' motion. Further, he does not otherwise respond to the argument that he failed to exhaust his administrative remedies prior to filing this action.  While Smith's Amended Complaint includes general allegations that he filed several grievances that were "lost" or discarded by staff [Record No. 5 at p. 5], as party opposing summary judgment motion, he may not "rest upon mere allegation or denials of his pleading," but must present affirmative evidence

-15-

supporting his claims. *See Anderson*, 477 U.S. at 256-57. Smith failed to sustain this burden here, as he did not respond to this argument. Based on the forgoing, while Smith began the administrative remedy process multiple times, he never successfully exhausted any of these claims. *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999) ("An inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so.").

## B.

The defendants also argue that summary judgment is warranted because Smith cannot demonstrate that they were deliberately indifferent to his serious medical needs and because he is unable to overcome their grant of qualified immunity. To state a cognizable claim that an official has violated a prisoner's Eighth Amendment rights with respect to medical care, the "prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to the plaintiff's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976). Such a claim involves a two-part inquiry containing an objective and a subjective component: (1) the plaintiff must allege a sufficiently serious medical need, and (2) the plaintiff must allege facts that "show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (quoting *Comstock v. McCrary*, 273 F.3d 693, 607 (6th Cir. 2001)). *See also Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

To satisfy the subjective component, the plaintiff must demonstrate that the defendant "acted with a mental state equivalent to criminal recklessness." *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (cleaned up). Thus, evaluating Smith's Eighth Amendment claim

requires consideration of the individual conduct of each defendant.[3]  Evidence that medical staff was negligent in the diagnosis or care of a prisoner's medical condition is insufficient to establish an Eighth Amendment violation.  *Id*.  *See also Farmer v. Brennan*, 511 U.S. 825, 838 (1994) ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."); *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) ("This test avoids turning the Eighth Amendment into a federal malpractice statute." ); *Comstock*, 273 F.3d at 703.

Smith's Eighth Amendment claim against Nurse Lawson is based upon allegations that, after his release from a 22-day quarantine after his September 16, 2022, arrival at USP-McCreary, he "filled out numerous 'sick-call' forms until Nurse Lawson finally brought [hum] several bandages" for his shoulder wound, but that Lawson did not attempt to put the bandages on the wound and told him to "figure it out."  [Record No. 5 at p. 2]  With respect to both Lawson and Sumner, Smith claims that these defendants told him to have has cellmate change the dressings for him.  [*Id*. at p. 2-3]  Finally, he contends that Cunnagin "repeatedly ignored the physicians at the University of Kentucky when they had ordered specialized treatment and follow-up appointments."  [Record No. 5 at p. 3]

---

[3] Assuming (without deciding) that a *Bivens* remedy may be implied for Smith's claims, while *Bivens* expressly validated the availability of a claim for damages against a federal official in his or her individual capacity, an officer is only responsible for his or her own conduct.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676-677 (2009).  *See also Ziglar v. Abbasi*, 137 S.Ct. 1843, 1860 (2017).  Thus, to recover against a given defendant in a *Bivens* action, the plaintiff "must allege that the defendant [was] personally involved in the alleged deprivation of federal rights."  *Nwaebo v. Hawk-Sawyer*, 83 F. App'x 85, 86 (6th Cir. 2003) (*citing Rizzo v. Goode*, 423 U.S. 362, 373-77 (1976)).

The defendants have submitted medical records demonstrating that Smith actually received extensive evaluation and treatment for his shoulder wound.  This includes being provided with bandages, wound care, medication, being sent for specialized treatment, and being provided with post-surgical treatment – from the time that he arrived at USP-McCreary in September 2021 until he was transferred to FMC-Lexington in May 2022.  The summary of Smith's medical treatment provided by the defendants, as well as the medical records cited in support of this summary, accurately reflects the information set forth in Smith's medical records.  As summarized by the defendants:

> On September 15, 2021, Smith received a Health Screening.  Then, on September 21, he received a History and Physical.  Smith reported a "sore" on his right shoulder for evaluation. No drainage was noted from the area, but some dry drainage was noted to the old dressing. Smith reported that he had the area for about 3 years and it "just has gotten bigger," but he had never seen Dermatology for it. The acting clinical director thought it could be a pyrogenic granuloma.  Smith was provided dressing supplies and told to wash with soap and water and apply dry dressing.  Smith was agreeable to the plan.  A Dermatology consultation was requested.  On the same date Smith was seen at a Clinical Encounter for the Chronic Care Clinic ("CCC").

> On October 19, a follow-up visit was performed at Health Services ("HSU").  It was noted that the Dermatology consult was approved and that there were no signs of infection in the skin lesion.  An evaluation was performed at HSU in November.  Smith reported to sick call that the skin lesion to the right shoulder was bleeding and was sent to HSU for evaluation.  No change in the area was noted since the last evaluation and no active bleeding/blood on the dressing was noted.  Smith was reminded a dermatology consult was already in place.  Smith was instructed to keep area clean and dry and notify medical if it got worse.

> Shortly after, Smith was seen by Dermatology.  A biopsy was completed. Smith was given Mupirocin 2% topical ointment to be applied daily, followed by Vaseline and dressing, for 14 days.  Ibuprofen was provided and a follow-up dermatology evaluation was requested pending biopsy results.

> On November 10, wound care was provided.  A minimal amount of blood was noted on the old dressing, but there was no active bleeding or signs of infection. The area was cleaned, Neomycin was applied along with Vaseline gauze and

-18-

dry dressing.  From November 11, 2022, to November 16, 2022, Smith received wound care.

On November 23, 2021, Dermatology called HSU stating that the wound culture grew a light growth of staph and they wanted Smith to be on Bactrim DS twice a day for 10 days.   On the same date a new medication order of Sulfamethoxazole/Trimeth DS 800-160 Mg 2 times a day for 10 days was issued for Smith.

In early December, Smith was assessed.   Smith still had the lesion to the shoulder area, but there was no need for daily wound care at the time.   It was noted the Dermatology follow-up was scheduled.  On December 14, the biopsy results revealed Dermatofibrosarcoma Protuberans, a cancerous lesion to the right shoulder.  Consultation for Dermatology follow-up and referral for general surgeon evaluation to remove the lesion were requested.  The next day, Smith was seen at Dermatology and received a referral for General Surgery.   On December 28, the general surgeon referred Smith to the University of Kentucky Markey Cancer Center ("UKMC").

In early January 2022, an urgent consult/evaluation by the UKMC was requested.  Smith was seen by Oncology on February 3.  Additional imaging was needed, so a CT prior to surgery was arranged as well as a consult for surgical procedure to remove the mass.  The risks and benefits of surgery were discussed with Smith.[4]

On February 7, the CT scan and Oncology visit for removal of the mass were requested. On February 9, a consult for a PRE-OP appointment and follow up of the CT-scan was made.  On February 10, the procedure was prepped.  On February 11, UKMC conducted a CT of the chest with IV contrast.  On February 14, Smith was prescribed Ibuprofen for pain.  And on February 15, Smith had surgery.   Post-surgery he received Oxycodone and Morphine for pain management.

On February 18, Smith had plastic surgery to have flap reconstruction.  As of February 25, Smith was still at UKMC with limited use of his right hand, restricted range of motion, and Robaxin, Gabapentin, as well as Oxycodone for pain management.  In late February, Smith continued on Robaxin, Gabapentin, as well as Oxycodone for pain management and limited use of his right arm right because of the surgery.

On March 1 and 2, Smith remained at UKMC on oxycodone, Ibuprofen, and Tylenol for pain management.   Smith's future needs at USP McCreary were discussed with UKMC, to include physical therapy ("PT") in 4-6 weeks.  On

---

[4] Smith stated to Oncology that he first noticed the mass/lesion in September 2020.

March 3, 2022, Smith was discharged from UKMC. Smith still had 1 drain in place to be emptied every shift and with output recorded, and would return with oxycodone twice a day, Tylenol, and ibuprofen for breakthrough pain in between oxycodone doses.  A March 8 follow-up with plastic surgery was scheduled with the plan to remove the remaining drain at that time.  Upon arrival at health services, the dressing was noted to be clean/dry/intact with a healing incision to right shoulder with no sutures. No bleeding was noted to the dressing. Motrin & Tylenol dose packs were provided and oxycodone tablets were ordered for pain management.

On March 4, Smith was evaluated upon his return to USP McCreary from UKMC.[5]  His discharge orders included Oxycodone 5 mg twice a day for 3 days; Acetaminophen 500 mg 1 tab by mouth every 6 hrs as need for pain for 10 days; Ibuprofen 400 mg by mouth every 6 hours as needed for mild pain for up to 10 days.  Smith reported that he was doing well, with pain managed by current pain medication.  Acetaminophen, Ibuprofen and Oxycodone were ordered along with follow-up consultation requests for Oncology.

On March 8, Smith was seen at Oncology for follow-up.  The JP drain to right side was removed and Smith returned to USP McCreary with the site clean and dry. On March 15, a Sick Call was performed at Health Services. Smith complained of pain and "cramping" and requested a muscle relaxer.  His provider ordered Motrin for his pain.  A small amount of drainage was noted and Smith was given large Band-Aids and instructed to wash area with soap and water and to keep area clean.  No redness or warmth was noted at surgical repair sites.

On March 21, Smith was seen at Health Services for complaints of an infected surgical area and pain.  The examination noted serosanguinous drainage approx. 3.5-inch dehisced area to surgical wound and purulent drainage on the dressing. Multiple scabbed areas to surgical wounds, none with drainage, were also noted, along with soft tissue swelling without warmth, redness or hardened area beneath right axilla that has been present since post-op day 16.  No fever, or chills were noted.  Smith was instructed to follow up with sick call as needed and to keep the area clean and dry.  Smith remained in the housing unit in stable condition.  Antibiotics and Motrin were ordered with wound care twice daily. From March 22 to March 26 wound care was provided to Smith. Smith was a no show for wound care on March 27 and March 28.

On March 24, a report/chart review was performed at Health Services.  On March 31, Smith was seen by Oncology for a follow-up visit.  The right shoulder/back flap was noted as warm and well perfused with a healing incision.

[5] Smith had been hospitalized since February 15 for right shoulder mass resection with flap Reconstruction.

The outside physician noted a decreased range of motion in the right shoulder, recommending in-house PT.

On April 1, a follow-up encounter was performed at Health Services. The right shoulder areas were noted to have healed with no signs of infection. Smith reported the areas to be tender but no redness or swelling to the sites was noted. The incisions were noted to have healed well. Health Services was noted as waiting for dictation paperwork from recent outside doctor visit.

On April 14, a general administrative encounter noted that outside doctor, Dr. Erin Burke, Oncology, phoned USP McCreary to inquire about Smith receiving PT. The discharge orders were reviewed and noted no orders for a PT plan. Shortly after, an orders note was received requesting aggressive PT to improve Smith's ROM and strength of his right shoulder. On May 4, Smith was transferred to the Federal Medical Center located in Lexington, Kentucky for right shoulder PT. On May 11, Smith was initially evaluated at FMC Lexington by a PT provider.

[Record No. 16 at p. 20-25, Exhibit 2: Cimarossa Decl. ¶3, Att. B]

Smith generally disputes the defendants' declarations in his rebuttal to the extent that they "tout that the Plaintiff was provided with all needed supplies for wound care, actual wound care or the needed prescription medication for the constant pain that Mr. Smith had been suffering." [Record No. 18 at p. 1-2] And while Smith concedes that "some supplies were given," he claims that they were "not nearly enough." [*Id.* at p. 2] He also argues that, even though he was given some supplies, it was still inappropriate to tell him to have his cellmate clean the wound and apply the dressings, as this process should have only been performed by "[a] trained professional in a sterile setting with gloved hands and the necessary supplies to perform the wound care safely." [*Id.*] And he asserts that, "although pain medications were prescribed by physicians at the clinic AND at the outside medical facilities, many remained UNFILLED." [*Id.*][6]   Finally, he argues that, while "Ibuprofen,

[6] Contrary to Smith's claims that his prescriptions were unfilled, and he was denied medication, his medical records demonstrate that, upon his return to USP-McCreary after his surgery, he

-21-

Acetaminophen and Gabapentin [may] be appropriate for minor . . . pain, they certainly aren't capable of easing the suffering of pain caused by an infected cancerous mass located on the patient's shoulder blade completely out of his reach."  [*Id*.]  He argues that "[h]e was in need of much stronger medication but was repeatedly denied."  [*Id*.]

But to defeat the defendants' properly supported motion for summary judgment, Smith may not "rest upon mere allegation or denials of his pleading," but must present affirmative evidence supporting his claims.  *See Anderson*, 477 U.S. at 256-57.  "[C]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment."  *Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017) (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).  *See also Banks v. Rockwell Int'l N. Am. Aircraft Operations*, 855 F.2d 324, 325 n. 1 (6th Cir. 1988) ("[A] motion for summary judgment may not be defeated by factual assertions in the brief of the party opposing it, since documents of this nature are self-serving and are not probative evidence of the existence or nonexistence of any factual issues."); *Perry v. Agric. Dep't*, No. 6: 14-168-DCR, 2016 WL 817127, at *10 (E.D. Ky. Feb. 29, 2016) ("[C]onclusory allegations are not evidence and are not adequate to oppose a motion for summary judgment.").

While Smith's rebuttal makes clear that he disagrees with the medical care that he received, this disagreement is insufficient to establish an Eighth Amendment claim.  With respect to his claims against Lawson and Sumner regarding his wound dressings, Smith concedes that he was, in fact, supplied with bandages, he just claims that they were not "nearly enough."  In addition to the fact that his claim that he was denied bandages is contradicted by

---

was provided with multiple medications, including Oxycodone, Tylenol, ibuprofen, Motrin, Acetaminophen, and antibiotics.

his medical records, Smith does not point to evidence supporting an inference that either Lawson or Sumner were specifically aware that the number of bandages that were provided to Smith were insufficient.  Nor does he allege (much less point to evidence creating a genuine dispute of material fact) that, when Lawson and Sumner suggested that his cellmate assist with changing his dressings, either of them made this suggestion despite subjectively perceiving that doing so would cause a substantial risk of harm to Smith, a risk that they then disregarded. And notwithstanding his claims to the contrary, Smith's medical records show that Smith received wound care treatment directly from medical staff (including Lawson) two times on November 11 and again on November 12, 13, 14, 15, and 16.  [Record No. 16-2, Cimarossa Decl., Att. B at p. 79]

Next, even if the suggestion that Smith's cellmate assist with changing his bandages was negligent, the failure to provide adequate medical care violates the Eighth Amendment "only when the doctor exhibits 'deliberate indifference to a prisoner's serious illness or injury' . . . that can be characterized as 'obduracy and wantonness' rather than 'inadvertence or error in good faith.'"  *Rhinehart*, 894 F.3d at 737 (quoting *Estelle*, 429 U.S. at 105, and *Wilson*, 501 U.S. at 299)).  "[T]he requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Johnson,* 398 F.3d at 875 (quoting *Comstock*, 273 F. 3d at 703).

And while Smith's Amended Complaint includes claims that Cunnagin "repeatedly ignored the physicians at the University of Kentucky when they had ordered specialized treatment and follow-up appointments," [Record No. 5 at p. 3], he does not point to any specific treatment or appointments that Cunnagin allegedly ignored.  Moreover, he does not dispute

-23-

information in the medical records demonstrating that Smith repeatedly was referred for outside evaluation and was treated by dermatology, oncology, and general surgery multiple times from November 2021 through April 2022.  And, despite his unsupported assertion in his rebuttal that many of his prescribed medications were unfilled, medical records indicate that Smith regularly was receiving multiple medications for his medical conditions, including antibiotics, prescription ointments, Oxycodone, Robaxin, Gabapentin, Tylenol, Motrin, and Acetaminophen.  To the extent Smith believes these medications were not sufficient to manage his pain, "[a]n inmate's disagreement with the testing and treatment he has received does not rise to the level of an Eighth Amendment violation." *Rhinehart*, 894 F.3d at 740 (cleaned up).

In summary, the defendants have submitted medical records documenting the extensive treatment that Smith received for his shoulder wound from the time that he arrived at USP-McCreary in September 2021 through the time that he was transferred to FMC Lexington in May 2022.  Smith does not dispute in his response that he received this treatment, but rather argues that this treatment was insufficient.  However, while Smith may disagree with the medical treatment provided by Lawson, Sumner, and Cunnagin – and, indeed, while he may argue that the treatment provided fell below the applicable standard of care – this disagreement does not suggest the sort of intentional indifference which is the touchstone of a constitutional claim under the Eighth Amendment.  *Lyons v. Brandy*, 430 F. App'x 377, 381 (6th Cir. 2011) (a prisoner's "disagreement with the exhaustive testing and treatment he received while incarcerated does not constitute an Eighth Amendment violation.") (citing *Estelle*, 429 U.S. at 107) (other citations omitted).  Rather, where (as here) a prisoner has been examined and provided treatment but the prisoner merely disagrees with the course of care determined by his treating physician in the exercise of her medical judgment, his claim sounds in tort law – it

does not state a viable claim of deliberate indifference under the Eighth Amendment. *See Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law."); *Durham v. Nu'Man*, 97 F. 3d 862, 868-69 (6th Cir. 1996). Even "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 F. 3d at 703.

Because Smith does not contradict information in medical records submitted by Defendants showing that he received extensive medical treatment for his shoulder wound, and because he does not otherwise come forward with any probative evidence demonstrating the existence of a factual question regarding the constitutional sufficiency of his medical care, he has failed to create a genuine issue of material fact regarding his Eighth Amendment claims against either Lawson, Sumner, or Cunnagin.

Moreover, as argued by the defendants (and not disputed by Smith), as no constitutional violation has occurred with respect to Smith's medical care, each of the defendants are entitled to qualified immunity from suit. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

When evaluating official immunity claims, the Sixth Circuit applies the following three-part test: "First, we determine whether a constitutional violation occurred; second, we

determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citation omitted).   Because no Eighth Amendment violation occurred, each defendant is entitled to and shielded by qualified immunity.

Accordingly, it is hereby **ORDERED** as follows:

1.     To the extent that Smith's "Rebuttal and Request to be Appointed Counsel" [Record No. 18] requests the appointment of counsel and/or could be construed as a motion for discovery filed pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, Smith's motion is **DENIED**.

2.     Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [Record No. 16] is **GRANTED**.

3.     Plaintiff's Amended Complaint [Record No. 5] is **DISMISSED**, with prejudice, and this matter is **STRICKEN** from the docket.

4.     Any other request for relief asserted in this action by the plaintiff is **DENIED AS MOOT**.

Dated:  May 24, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

-26-